Item 30164, Seth B. v. Orleans Parish School Board Item 30164, Mr. Laspinato. I have one thing to begin with. We are here on the matter of whether the school district should have paid for the IEE. That's okay, council. But the question of whether this student received a FAPE is not before us in any way, right? That's correct, Your Honor. And it was ruled—I gather that the parents' criticism of the program, the IED, was rejected. Is that right? There was a hearing in 2012 where the parents did not prevail on their claim that the services and program offered by the school district were appropriate. That's correct. May it please the Court, my name is Ronald Laspinato, and I represent the plaintiffs Don, Cheryl, and Seth B. This case concerns a district court decision affirming the refusal of the defendant to ensure that an independent educational evaluation that the parents had attained, with its approval, was provided at public expense. The regulation at issue is the United States Department of Education Regulation 34 CFR section 300.502, which was promulgated under the Individuals with Disabilities Education Act, or IDEA. It guarantees parents a publicly funded independent educational evaluation, or IE, as I'll refer to it during this argument, under appropriate circumstances when they disagree with the school district's evaluation of their child. At the time this case arose, Seth B. was 15 years old and was identified as a student with autism. We contend that the district court committed reversible error in three respects. First, the court failed to address the failure of the school district to comply with the clear procedural requirements of 34 CFR section 300.502B that require a school district to either provide an IE at public expense or request a hearing to show that it is not required to do so. Second, the district court erred in rejecting the argument that defendant's expansive agency criteria, coupled with its after-the-fact determination that it would not pay for plaintiff's IE, are impermissible under the IDEA and inconsistent with the right to obtain an IE at public expense. And finally, since there was significant credible evidence that plaintiff's IE complied with Bulletin 1508, the district court erred in not either permitting the case to proceed to trial or remanding the case to the Division of Administrative Law, Louisiana's Division of Administrative Law, for an evidentiary hearing. On the first issue, the IDEA's procedural requirements are explicit on what a defendant is required to do upon receiving a request for an IE or once an issue regarding the agency criteria has been established. It must either provide the IE at public expense or obtain a ruling in an administrative hearing that it was not obligated to fund the IE. The district had three chances to provide an IE at public expense or seek an administrative ruling. Let me ask you a question. This was a very long record. We did not get into all of it before oral argument. I looked at Bulletin 1508, which I thought was sort of the heart of the compliance issue here, and it looks to me, unless I misread it, as if all it does is copy the regulation, the federal regulations. Is that fair, or where does it go? I think that it goes into significantly more detail than the school district evaluations. What I would point out is that it's a 144-page document that applies to how a school district should conduct its evaluations and re-evaluations of students. But it does build on the federal regulations, but it goes beyond them as well. Well, but what does it say? I thought the parents here got some kind of document from two experts, right? They did. They got a 45-page . . . well, they ended up with, ultimately in April of 2012, they got an IE report. It was a report that was created by a number of experts, including a psychologist, an occupational therapist, a physical therapist, an educator. It was a combined report of 45 pages, and they provided that with the school district, and that's what the school district rejected. Right, but my understanding is that it didn't explicitly comply with the requirements of Bulletin 1508, but you say it substantially complied. Well, we say . . . well, there are two things that we say. We say, at a minimum, it substantially applied. There were some things that were missing. So, for example, an adaptive physical education evaluation was never done, but we didn't think that was necessary. The parents never thought that was necessary. They didn't disagree with the school district's prior evaluation in that area. There are some other issues that, for example, that the IE wasn't signed. I mean, obviously signing an IE is important and can be easily accomplished, but it's certainly not the basis for withholding payment for an IE. It would have been a lot more helpful for both sides if you had told us, other than saying it doesn't comply in 31 respects, and yes, it does, to have been a little more precise in the briefing, because I was very frustrated in trying to figure out exactly what the problem was. Well . . . It was good enough for the person to use in the hearing on the IE individualized education plan, right, because they introduced it. Oh, you mean the IE report. Yes, that's right. That's correct. They did introduce the report. Now, you have to understand that that report was completed after that hearing had been initiated, and to the extent that there was any discussion of that report at the hearing, it was before . . . well, some of it was before and some of it was after the school district issued its decision. The point I'm making is that whether the IE complied with Bulletin 1508 was never an issue at that hearing in any meaningful sense. It was just simply referenced and argued. What's the point of it if it's not even ready until after the hearing? Well, it was ready . . . it was presented at the hearing. The point of it was really to provide the . . . I mean, the point of an IE generally is to provide the school district with information that it can use in helping to improve the education of the child. And for that purpose, the parents submitted it and expected the school district to consider it. They also attempted to use it at the hearing. Obviously, that didn't work out well for them. But that's sort of . . . that is irrelevant to this claim, and the reason is . . . You just told me it wasn't even ready for the hearing. Well, that's . . . it was completed after the hearing was initiated, but before the hearing began. It was reviewed . . . it was reviewed by the district after the hearing began. And then at . . . somewhere in the middle of that hearing, in March of 2012, the school district issued a decision basically saying it doesn't comply, and this is why it doesn't comply. But it was never . . . but the point I'm making is that in terms of the IE requirements, the 2012 hearing had nothing to do with that. I understand your argument on that point. I just . . . I just don't quite understand. Why did you bother to continue to go after this if your clients . . . well, whoever's clients was at the time, or lawyer, got the substance of the report in at the hearing? Wasn't that the important thing? No, the important thing was that the school district received the report and actually do something about it. And all they did was simply say it doesn't meet our criteria and we're not going to pay for it. I understand that, but I'm just asking . . . I don't want to waste all your time. I was just asking what's the practical bottom line here? Well, the practical bottom line is if the school district had done what it was supposed to do, which is that they either paid for the evaluation and considered it, or went to a hearing officer and said, this report doesn't comply with agency criteria, then that issue would have been resolved when Seth was probably 15 or 16 years old. And, for example, if the hearing officer had ultimately said, we think that it substantially complies with agency criteria, the IE regulations require the school district to consider that report. And they never had . . . and that was never done in this case. But they did consider the substance of the report in the hearing because the same experts testified. That's right. The hearing officer ultimately did consider it to some degree. I'm still a little unsure whether you request . . . whether your clients requested limited IEE or a comprehensive IEE. Well, the parents said that the parent . . . the document you're referring to, the parents basically made the statement that the law requires that parents have a right to a comprehensive IEE. But the parents, generally speaking, had a couple of complaints with the school district's prior evaluation, an evaluation that was completed in 2010. Their complaints concerned an occupational therapy evaluation that they said was inadequate. There were some complaints that they had regarding the student's social functioning. And then there was . . . Not to . . . wasn't there something about an additional learning disability? Well, that didn't actually come up. The record is a little muddied on that, but to be honest, the issue of the learning disability did not come up until the report was completed. And at that point, the examiners basically said, we think this kid has a learning disability and the school district ought to do something about it. But because the school district . . . because of the posture it was in, that report basically . . . that part of the report basically fell on deaf ears. But it shouldn't have influenced whether the school district paid for it in the least. It was just a responsible thing for evaluators to do. I see this problem and the school district should address it. What about the fact that you're . . . No, that's not true. And for the benefit of the audience, it's very frustrating when you don't have any idea what the record says because the briefs so violently disagree. But . . . Well . . . The school board does say that the . . . that when this IEE came out, the school board said it doesn't look right. Somebody for the school said it doesn't look right. You call our expert and she'll tell your expert how to modify the report. But the parents never did that. That part is correct and they didn't do it for three reasons. The first reason is they didn't think that the report did comply with Bulletin 1508. The second reason is that they had spent a lot of money on the evaluation and it was going to cost them more money to go back to their experts a third time. And then lastly, and I think which is important to consider, that really it was incumbent on the school district to take action, not upon the parents. The regulations are very clear. It basically says that if a school district believes that a report does not meet agency criteria, then it should request a hearing to make that . . . to resolve that issue. And they didn't do that. Why didn't the parents just say those things and say, why couldn't they call a hearing? Why do they sit back for two years until there's a hearing? Well, they made a request. I know, but they wanted the money. So, why didn't they call the hearing and say, school board won't call it. We want it. Ultimately, that's what they did. I mean, there were two . . . there was a demand letter that was written in, I forget, December 2012. And a response to that later and following that response, basically the school district said no and the parents requested a hearing. They did it as, you know, they did what they needed to do and the school district . . . it was really up to the school district. How did the parents locate the expert? Well, if you look at the affidavit of Cheryl B., they really had to search high and low to find people who would do the evaluation and do it for that amount of money. They had to search high and low. It was a very exhaustive search and ultimately they found people, but they had to go through quite a bit of effort to make that happen. The school doesn't have any recommendations or experts. Does the system itself, the school system, provide any resource for identification of experts out there that can assist parents? Well, in this case, they named two entities that potentially could do the evaluations, but neither of those were suitable for the parents. One was an employer of the plaintiff, the father in the case, and another is one that was consulting with the school district that they are. They didn't feel that those people were sufficiently independent to conduct the evaluation. So, the parents did what they had a right to do under this to try to find evaluators who could meet the school district's criteria and do the evaluation. I'm just trying to understand how this actually operates and works. Most parents confronted with this are not going to have at their hands a list of experts. That's correct. That school, on the other hand, would ordinarily have people they work with and identify and so forth. That was definitely a problem. The school district, as I said, had a very limited list and neither of those were suitable. That just fell back on the parents to come up with people who could do this evaluation. One of the agencies that does this type of work or institutions that does this type of work was actually the employer of the plaintiff's father? That's correct, Your Honor. So, why didn't he get it for free? Good question, Your Honor. He just felt that that was not a very comfortable position to be in, so he didn't feel like he could get an independent evaluation. The suggestion was that he may have some expertise himself, or was he working in some other group? Yeah, he's a teacher. No, that's correct. He's knowledgeable about education and teaching, not necessarily knowledgeable about all the ins and outs of the special education system, although he certainly has learned when you're thrown into the fire, you just have to deal with it the best you can. He's better equipped to navigate this terrain than most people. Well, that's correct, and in fact, that's sort of an interesting aspect of this, is that these are parents that are educated and committed and interested in their child, and there are so many parents out there who . . . In most of these cases, they're all sad cases, difficult cases, because it's really the dedicated parents who are in there fighting for their kids most of the time. That's correct, Your Honor. That's correct, and that's what happened in this case. Anyway, the school district had three opportunities to request a hearing. The first time was at the time of the request, which was in August of 2011. The second was at the time the parents indicated they were unable to meet the $3,000 limit, and that was in November of 2011. And then, lastly, they could have taken action in May of 2012 when they issued a determination that the IE did not meet agency criteria. In the first instance, the school district explicitly elected not to argue that its evaluations were appropriate. Do you have time for rebuttal? Thank you, Your Honor. All right, thank you. Mr. Stewart, exactly in what respects was this report not, aside from the money, not compliant with Bulletin 1508? Well, Your Honors, good morning. May it please the Court, my name is Wayne Stewart, counsel for the defendant Appelli, Orleans Parish School Board. I'm going to have to keep your voice up. The acoustics get worse every year in this courtroom. To answer your question specifically, Judge Jones, is if you would make reference to the record at 1702 through 1705, it makes explicit reference to the 31 issues of noncompliance. The parents have also submitted those 31 areas of noncompliance at 1667 to 1670. And so those 31 areas, I mean, when counsel for the parents indicated that, oh, well, there was just a missing signature and there was a missing APE evaluation, well, that's two. That's two of 31 issues. Well, now, there's issues and then there's issues, and you listed them in your brief somewhere, right? You identified them in general, several generic categories in your brief, didn't you? Yes, Your Honor, as far as making reference to the record. They don't do the right tests? No, Your Honor, as far as looking back to 1508 criteria, is that 1508 criteria are the agency criteria under which every school system in Louisiana must conduct evaluations. Under Section 107A.5 of those regulations, these regulations in 1508 with regard to conducting evaluations, both initial and re-eval, apply to independent evaluators. Many times, school systems, either by not having available staff or making a determination that cost is prohibitive, will contract with private evaluators, and the private evaluators must meet the same. I understand that, and I'm very sympathetic to that, but I did not see. We were looking at Chapter 5 and Chapter 7, so we were, I guess, looking at the wrong part of Bulletin 1508. Is that right? Yes, ma'am, Bulletin 1508. And what, to address a couple issues that were raised in the parents' argument, is first, Judge Smith's question is, did the parent actually request a comprehensive evaluation? And the answer is yes. If you look at the record at 1230, it says, quote, they requested a comprehensive IEE at public expense. So there's no mincing of words there. Contrary to what parents' counsel indicated, is that they never expressed in their request for evaluation what their specific concerns were about the evaluation. So the school board takes at face value they want a comprehensive evaluation at public expense. The school system within a week said we will provide it at public expense as long as it meets agency criteria, which is Bulletin 1508. And including a limited cost, right? Yes, sir. There's a limited cost. However, if the parents demonstrate unique commentary to the IDEA regulations in 2006 by the U.S. Department of Education, allow the parents to demonstrate unique circumstances which may allow that cap to increase. And so under these circumstances, the threshold issue is, is it compliant? The school system has not denied the parent reimbursement for an evaluation that is compliant. If you go out and you pay this kind of money to an expert who specializes in this field, they wouldn't know the operative requirements of the law as to what the report is supposed to comply with. The reason I ask the question is that the implication of that is, look, this expert knows what complies, but they were asked to do something else or more. Now, I guess I don't follow what happened. I go out and hire an expert to help me, and the law requires they're supposed to include A, B, and C, and they don't give me A, B, and C, then I think they don't know what they're doing. Unless I tell them that I don't want A, B, and C, I also want D, E, and F. Well, Your Honor, with regard to what the independent evaluator knew or did not know, the school system provided notice, and it's reflected in the record, undisputed, that the school system provided notice to the parents when they made the request for the comprehensive IEE that it meet 1508 criteria. Presumptively, when the parents contacted their chosen evaluators, they indicated the school system has said they will pay for an evaluation as long as it meets 1508 criteria. The evaluation that was submitted to the school system on the eve of the 2012 due process hearing indicated that it was compliant with Bulletin 1508, but as the school system demonstrated, and the key term there is demonstrate. Parents' counsel indicated that the school system is required to request a hearing. That is not true. The express language of that provision in the regulation says the school system must demonstrate at a hearing, which it did in 2012, which it did again at the administrative level below. It did again at the district court level. What were the substantive failings of the report? Is the board's problem that the report covered more than it should or that it covered less than it should? It covered less than it should. Well, you were saying they improperly asked for a comprehensive report, and it was an initial evaluation, not a reevaluation. So how can it be less than it should and also be a comprehensive report? Your Honor, just to respectfully disagree with your characterization to say that the school system said it shouldn't be comprehensive. The parent requested that. Bulletin 1508 requires it to be comprehensive. Bulletin 1508 of the state regulations that are promulgated by— But you said there's a difference between an initial evaluation and a reevaluation. Is there not? There is, Your Honor. However, as explained in the briefing, both at the district court level as well as at the administrative level, and here in our reply brief, is that even if this were considered a reevaluation, that if a new exceptionality, that is, a new disability, is suspected, Bulletin 1508 requires that you comply with the initial criteria for that disability. Okay, then their response is that we didn't do— because we did not disagree with the way the school district had evaluated some of those elements. Okay, and, Your Honor, even given that for the sake of argument? That is not—that's what they say. Well, that's what they said, but assuming that they didn't want everything, even though they said they wanted a comprehensive evaluation, is that counter to what parents' counsel has indicated is that if you look at the record at 908 as well as the district court noting it at 1230, is that, I quote, at the time the IEE was conducted, SB was identified as a student with autism. The parents also suspected that he might also have a learning disability, end quote. So to say that they did not know that he had a learning disability or even suspect that he had a learning disability until after they received the evaluation is completely counter to their admission. But is it not possible? Because, frankly, this is so inspecific about what the additional learning— we never know what the additional learning disability was suspected to be. But so, given that, they're still saying, suppose it was dyslexia and they weren't going to test him for some kind of sight difficulty. I mean, dyslexia but not a vision impairment like being functionally blind. I mean, the assessment in and of itself has to address, and the independent evaluator— Why does it have to address things that aren't even possible for this particular student? Is that part of the disagreement? No, Your Honor. I mean, you've never— I'm trying to—go ahead, Your Honor. Tell us why in the report was deficient. Exactly. The report was deficient— One, two, three. Stay out of the jargon. Just tell us why it was deficient. The report was deficient in multiple areas, 31 areas, with regard to the initial evaluation criteria for specific learning disability. It also did not have— You haven't done anything but cite code to me. Why was it deficient? Your Honor, as we've referenced within— I don't have that right here in front of me as far as the 31 areas. Make reference to the record. It's 1702 through 1705, the 31 various areas. That is what the school system is required to do under the regulations, under 1508. When it receives any evaluation from an outside source, whether it's an independent evaluation, it must review it. What we're trying to understand is that we're here because the school says that the report's deficient, and the other side says it's not. I haven't heard anybody articulate that it's deficient other than saying, well, under 1508, they have to have this, and you use words like comprehensive. Can you give us any more than that? Well, Your Honor, as far as the initial evaluation, it must include a review of existing information. Review of existing information. Parents Council had already admitted that an adaptive physical education evaluation was not included. There were multiple other areas in which the evaluation did not comply with 1508.  As Judge Jones had asked counsel for the parents, is it basically parroting what the federal regulation? No. Wherein do you disagree as to deficiencies? There is some agreement that the report was deficient in some respects. Yes, sir. They have already admitted at multiple levels, and even here, an oral argument, that there are areas which do not meet. There are elements that are missing. There are 31 areas. The school system does not have the discretion to say, hey, we're going to waive this requirement. These are regulations that are promulgated by the state of Louisiana in compliance with IDEA, and it's the standards. It is a fair, consistent application of the regulations which are promulgated under IDEA. And so it is true in some circumstances where if a parent just were to request a functional behavioral assessment, an FBA, that that in and of itself, if they requested that particular evaluation, that could constitute an IEE. However, given the fact that the parent requested the comprehensive IEE, rejected the evaluators that the school system offered, as Judge Jones had pointed out and counsel had admitted, is that the parents did not come back to the school system. The school system could have provided other individuals or other school systems that could have done the evaluation. I assume this young man had been evaluated for autism for some years, right? Yes, ma'am. So it was basically an ongoing process. And I also infer, although it's not clear to me, that the purpose of the hearing in March of 2012 was to refine certain areas of his IED, right? Your Honor, the hearing that the parents had requested in 2012 was one where they were challenging the IEP. They said it was a denial of FAPE. And at the end of the day, at the end of the hearing, after the school system demonstrated the IEE, it was not a denial of FAPE, that the school system had provided FAPE. There has never been a judicial determination at any level. I understand that. And so far as I know, we don't have an appeal of the FAPE determination. But fine. But what I'm saying is, why does there have to be rote compliance with 1508, which I gather is a 140-page bulletin, when you're 10 years into the educational process and presumably the parents had focused concerns about the deficiencies in the educational program? Well, Your Honor, as far as stating what the school system is required to do, the agency criteria are defined at 34 CFR 300.502E. And it's saying specifically, if an independent educational evaluation is at public expense, the criteria under which the evaluation is obtained, including the location of the evaluation and qualifications of the examiner, must be the same criteria that the public agency uses when it initiates an evaluation, to the extent that those criteria are consistent with the parents' right to the independent evaluation. So basically you're saying if every other year the parents want a hearing on the IEP and they want an independent educational evaluation to which they are entitled by law at expense of the district, then they have to go through the entire rigmarole as if the student had just come into the district again. Is that what you are saying that Bulletin 1508 requires? No, ma'am. I would not characterize it as a rigmarole. The parent is entitled by law to one independent... But you keep saying they did not comply with the entire evaluation and that's why they don't get a dime, but they can agree to something less? Your Honour, just as far as the general rule, looking at textual reasoning here with regard to IDEA... I understand the criteria, but, you know, they could say, my kid is in a wheelchair and the PE that they provide for him with that limitation, we're not disagreeing with. We are disagreeing about whether he has access to the art classroom or whether he has access to a proper science classroom consistent with his abilities. If that were the case, and I have no idea, based on the vagueness of these briefs, but if that were the case, the district would not require the parents to go back and get the PE evaluation all over again when they weren't even disagreeing with it, would they? Potentially, Your Honour. What is your argument about 1508? My argument regarding 1508 is that the general rule is that it must meet the agency criteria. The agency criteria Bulletin 1508, which every other school system in Louisiana must follow, that every team within a school system must follow, and the parent requested the IEE, they sought out the evaluators, and so it said it must meet 1508 criteria. Only those areas, only within autism, and the evaluator, the school system did not say, you have to do the LD criteria. Their chosen evaluator decided to look at an LD issue because that's what the parents requested. The school system provided no further constraints upon that to say, here are the regulations. Private evaluator, as an expert, you can read this document and follow the recipe to be able to do this evaluation. And as I understand it, the reason why the school districts can impose the same criteria on the parents, even though it's sort of a vague term in context, but the reason why it can impose the same criteria is so that everybody's on the same page with regard to the student, right? Exactly, Your Honour. Fine. So what was the biggest substantive deficiency in this expert report vis-à-vis what the school district was trying to do? Well, as far as saying the largest, 1508 does not make a ranking of what is the most important or not. But to answer your question just from a perspective is that it did not contain, I mean, since the child was determined by their private evaluators having a learning disability, there would have to have been a specific intervention process to determine whether the child, and there is a very comprehensive system of evaluating for a specific learning disability that is prescribed by IDEA, which is replicated in detail in 1508, and that process was not followed. The most important, from my perspective, having been an evaluator in a school system previously and extremely familiar with 1508 as a lawyer and a practitioner, is that there was no intervention requirement. Intervention means basically the IDEA congressional intent was that we are not going to have school systems identify children where the fault is not on the child, that perhaps the child has not received effective instruction. And so they want to be able to rule out that it's not cultural factors, it's not socioeconomic factors, it's not that the child did not receive effective instruction, that somehow the child had some type of sensory impairment. There has to be an intervention within that process. There was no intervention. Is that a meeting? No, Your Honor, an intervention would be, let's say the child is suspected, and in this case, the parents had concerns about the child's math ability. And now, let's just say the young man has problems with math. So the intervention would have specifically addressed math, or the child had issues in reading, reading comprehension, or decoding, or those various areas in reading, that there would have been an intervention that specifically addressed that concern. Is an intervention a description? What is an intervention? No, an intervention is actually a process whereby you would collect information as to the child's performance on particular skills, make some kind of screening or diagnostic based upon what he's doing in the curriculum or not, and then design through an empirically based intervention as is required by... What you're saying is that we started off with an autistic child, and that has a particular regimen for determining an appropriate program for the child. But then we went to a learning disability, and that has a distinct regimen or discipline for determining the response. Is that correct? Your Honour, they're both within... Is that correct? Yes, sir. You both look at those areas of 1508. So what you're saying is that the deficiency here is that the parents, when they went to their expert, either they asked for or the expert came back with recommendations for learning disability, and it had not gone through that discipline. Your Honour, may I answer your question? Is that... Yes, sir. The evaluator did not... You're talking about intervention as just a distinct process or discipline for responding to that discipline. To learning disability, but then there's an intervention requirement generally. There would not have been an intervention required... Intervention is a mean... That is such a misuse of... I just don't even understand it. The only intervention I know of is when I'm... The kid's not an alcoholic, I mean. Exactly. That's the kind I know of. Your Honour, in the terms of education and in psychology, intervention has a specific meaning. Let me just... We will look it up, and your time has expired, but let me just suggest that when you fellows brief these kinds of cases to us again, you need to give us a glossary, because we do not... We will look to both sides in these cases, but without an understanding of what the fundamental terms mean in plain English, I'm at sea. And, your Honour, we would be glad to be able to provide some supplemental briefing if you would request that. If you want to do that in a 28J letter, do whatever you want. That would be fine. Just file it within about seven days, please. One of the difficulties of being a specialist, as you obviously are, same true in tax specialists, and some other specialists, the lawyers are highly... They're talking to each other, and they're talking their own jargon, and the judges are generalists at best, so you have to get it down to where they can understand it. And I apologize, your Honour, I mean, with your experience in the IDEA cases, I would have... Well, we've never... I mean, as you know, there's hardly any case law on this, who's going to pay for, you know, the rules for paying for an IE. Yes, Your Honour. We have a little familiarity with the IEDs and the FAPEs at this point in time, but... All right, thank you, Your Honour. All right, thank you. First of all, with respect to the 31 violations, during the course of the proceedings in the district court, the plaintiffs submitted a document, and it's found at 924 of the record, that essentially lines up each of the complaints that the school district had with the IE in our response. And so there's a side-by-side response that basically says that none of the 31 areas of... that they identified are grounds for denying reimbursement. What do you do with the one that was just discussed about the learning disability and the intervention? I'm glad Your Honour mentioned that. The Office of Special Education Programs of the Department of Education has actually rendered a decision which I think this court ought to take into account when it makes that decision. We contended all along that the learning disability issue was no basis for denying reimbursement, that it was information, and this really goes to the different function that an IE plays versus the school district's obligation to do a complete evaluation. What the evaluators are doing are providing information to the school district upon which they can make decisions. The IE people are not decision-makers. In a ruling... Let's back up a minute. I'm not sure you've directly addressed my question. I'll try again. Did the IEE specifically propose any kind of intervention for any learning disability problem? It made a number of proposals and recommendations regarding addressing the learning disability, yes, Your Honour. And I think... What did it say? To be honest with you, I don't have the evaluation in front of me and I don't recall the specifics. Are you answering yes to my question, which is, did it propose an intervention for a learning disability? Correct. It made recommendations regarding specific services that the child should receive. For the learning disability. Correct. Correct. But the issue of whether this was an initial evaluation or re-evaluation is an important issue because the school district, in its 31 issues, basically the vast majority of those deal with whether this was an initial evaluation rather than a re-evaluation. And the Office of Special Education Programs, in letter to Baus, and that's spelled B-A-U-S, ruled that when a school district conducts an evaluation and the parent disagrees with the evaluation because it was not assessed in a particular area, the parent has a right to request an I.E. to assess the child in that area to determine whether the child has a disability and the child's educational needs. OSEP also held that an I.E. in this context is a re-evaluation, not an initial evaluation. And so if you look at the side-by-side analysis we provided of each of the areas of noncompliance, we point out that many of these things were simply not required in an I.E. report because they concern initial evaluations, not re-evaluations. And what we feel was really important, and this is why parents need an independent educational evaluation, is that that 45-page report provided the school district with valuable information that they could have taken and made some different decisions. OSEP used it substantively in the hearing in March. That's correct, Your Honor. That's right. And so it was an important document. Unfortunately, the hearing officer didn't see it the way we wanted to see it. I mean, I wasn't involved in the case. But that's the way it goes. There's no guarantee when you get an independent evaluation that the school district will do anything. All they have, their only obligation, is to consider it. So the other... I'm sorry, my time is up. I'm afraid your time is up, but we have your briefing. Thank you, Your Honor. Thank you very much. The court will stand in recess.